**RECORD NO. 13-1984**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

―――――――

RHETT GAVIN STUART,

*Plaintiff - Appellant,*

v.

SPRINGS INDUSTRIES, INC.,

*Defendant - Appellee.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT ROCK HILL

―――――――

**RESPONSE BRIEF OF APPELLEE
SPRINGS INDUSTRIES, INC.**

―――――――

Ronald B. Diegel (Federal I.D. No. 5827)
Peter E. Farr (Federal I.D. No. 9709)
Ashley B. Stratton (Federal I.D. No. 10508)
MURPHY GRANTLAND, P.A.
4406-B Forest Drive (29206)
P. O. Box 6648
Columbia, South Carolina 29260
(803) 782-4100

*Counsel for Appellee*
*Springs Industries, Inc.*

January 23, 2014

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. <u>13-1984</u>        Caption: <u>Rhett Stuart v. Springs Industries, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Springs Industries, Inc.</u>
(name of party/amicus)

_____

who is _____<u>appellee</u>_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                           ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Peter E. Farr                           Date:    August 19, 2013

Counsel for: Springs Industries, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on ___August 19, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

David B. Marvel, Esquire
Prenner & Marvel
636 King Street
Charleston, SC 29403

s/ Peter E. Farr                                    August 19, 2013
       (signature)                                         (date)

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Issues on Appeal ......................................................................................1

Statement of the Case...............................................................................2

Statement of the Facts ..............................................................................4

Summary of Argument..............................................................................9

Standard of Review.................................................................................10

Argument.................................................................................................11

    I) SUMMARY JUDGMENT SHOULD BE AFFIRMED WHEN THERE
       IS NO EVIDENCE SPRINGS OWED STUART A DUTY OF CARE..11

    II) EVEN IF SECTION 388 IMPOSES A DUTY ON SPRINGS, THE
       SOPHISTICATED USER DEFENSE OF SUBSECTION (B) LIMITS
       SPRINGS' LIABILITY...............................................................14

       A) SPRINGS HAD REASON TO BELIEVE THE CITY WOULD
          REALIZE THE FORKLIFT'S DANGEROUS CONDITION...........14

       B) THE BURDEN OF PROVING THE INAPPLICABILITY OF THE
          SOPHISTICATED USER DEFENSE RESTS ON STUART...........19

    III) SUMMARY JUDGMENT FOR SPRINGS SHOULD BE
       AFFIRMED BASED ON SOUTH CAROLINA STATUTORY AND
       COMMON LAW WHICH PROVIDES NO BASIS FOR IMPOSING
       LIABILITY ................................................................................21

       A) SOUTH CAROLINA COMMON LAW DOES NOT PROVIDE
          ANY BASIS FOR A DUTY OWED BY SPRINGS TO STUART...21

       B) SOUTH CAROLINA BARS RECOVERY BECAUSE STUART
          WAS AWARE OF THE DANGER AND PROCEEDED
          UNREASONABLY TO MAKE USE OF THE FORKLIFT .............25

i

C) STUART'S ASSUMPTION OF THE RISK AND
OVERWHELMING NEGLIGENCE FAR EXCEEDS ANY
NEGLIGENCE ON THE PART OF SPRINGS ................................26

Conclusion ............................................................................................28

Certificate of Compliance .......................................................................30

Certificate of Filing and Service ............................................................31

Addendum

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Bauer v. United States*, 882 F.Supp. 516 (D.S.C. 1995) ...................................22, 24

*Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985) .........................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986)............................10

*Coffey v. Chemical Specialties, Inc.*, No. 92-2397,
1993 WL 318886 (4th Cir. Aug. 20, 1993)................................................................13

*Drewitt v. Pratt*, 999 F. 2d 774 (4th Cir. 1993) ......................................................10

*Ervin v. Continental Conveyor & Equipment Co., Inc.*,
674 F.Supp.2d 709 (D.S.C. 2009)..............................................................................26

*O'Neal v. Celanese Corp.*, 10 F.3d 249 (4th Cir. 1993)............................... 14-16, 19

*Sewell v. Wrap-On Co., Inc.*, No. 92-1720,
1993 WL 18329 (4th Cir. Jan. 29, 1993) ..................................................................27

*Shealy v. Winston*, 929 F.2d 1009 (4th Cir. 1991) ..................................................10

### <u>State Cases</u>

*Bloom v. Ravoira*, 529 S.E.2d 710 (S.C. 2000) .......................................................26

*Bragg v. Hi-Ranger*, 462 S.E.2d 321 (S.C. Ct. App. 1995)...............................14, 20

*Davenport v. Cotton Hope Plantation Horizontal Property Regime*,
508 S.E.2d 565 (S.C. 1998) .................................................................................25, 26

*Estate of Haley v. Brown*, 634 S.E.2d 62 (S.C. Ct. App. 2006) ............................26

*Hopson v. Clary*, 468 S.E.2d 305 (S.C. Ct. App. 1996).........................................26

*Lawing v. Trinity Manufacturing, Inc.*, 749 S.E.2d 126 (S.C. Ct. App. 2013) .......15

*McCullough v. Goodrich & Pennington Mortgage Fund, Inc.*,
644 S.E.2d 43 (S.C. 2007). ....................................................................22

*Oblachinski v. Reynolds*, 706 S.E.2d 844 (S.C. 2011) ............................22

*Singleton v. Sherer*, 659 S.E.2d 196 (S.C. Ct. App. 2008)......................26

*Trask v. Beaufort County*, 709 S.E.2d 536 (S.C. Ct. App. 2011)............22

### Rules and Statutes

Rule 56, FRCP ........................................................................................10

S.C. Code Ann. § 15-73-20.............................................................3, 12, 25

### Secondary Authority

Restatement (Second) of Torts § 388 ................................... 2-4, 9, 11-14, 19-21, 28

Restatement (Second) of Torts § 402A...................................................12

Restatement (Second) of Torts § 405 ...............................................2, 12

## STATEMENT OF THE ISSUES ON APPEAL

I)    WHETHER SUMMARY JUDGMENT SHOULD BE AFFIRMED WHEN THERE IS NO EVIDENCE SPRINGS OWED STUART A DUTY OF CARE.

II)   WHETHER THE SOPHISTICATED USER DEFENSE OF SUBSECTION (B) LIMITS SPRINGS' LIABILITY IN THE EVENT SECTION 388 IMPOSES A DUTY ON SPRINGS.

III)  WHETHER SUMMARY JUDGMENT SHOULD BE AFFIRMED BASED ON SOUTH CAROLINA STATUTORY AND COMMON LAW WHICH PROVIDES NO BASIS FOR IMPOSING LIABILITY.

## STATEMENT OF THE CASE

Appellant Rhett Gavin Stuart seeks recovery for injuries he received when the forklift he was operating malfunctioned, tipped over, and partially ejected him. The accident occurred on July 9, 2010, when Stuart was moving equipment in the scope and course of his employment as a fireman for the City of Lancaster.  The location of the accident was property containing a mill formerly owned and operated by Appellee Springs Industries, Inc.   In 2005, Springs donated the building known as the Manufacturing Services Center, together with its contents and the land on which the building sat to the City of Lancaster.  (App. pp. 143, 145.)

Stuart's negligence claim alleged Springs (1) failed to retrofit the forklift with a seatbelt despite the manufacturer's recommendation and offer to complete retrofitting; (2) made the forklift more dangerous by adding a Roll Over Protection System (ROPS) without also adding a seatbelt; and (3) donated the forklift to the City without correcting this dangerous condition.   Springs moved to dismiss Stuart's negligence claim arguing that it owed no duty to Stuart because the forklift was part of a donation of property to the City.  The District Court requested additional briefing on the applicability of Restatement (Second) of Torts Sections 388 and 405 and allowed Stuart to amend his complaint in which he asserted a claim for negligent failure to warn Stuart and the City of the dangerous condition.

2

The District Court denied Springs' Motion to Dismiss based on the possibility that Springs owed Stuart a duty under Restatement (Second) of Torts Section 388 which had been adopted by South Carolina and applied to "suppliers" in the products liability context but not to donors such as Springs in a charity context. Specifically, the Court refused to address the question of whether Section 388 applies to donors based on its preference for further development of the facts in order to clarify "an important and novel question." The Court also desired further development of the facts related to what it considered affirmative defenses listed in subparagraphs (a) through (c) of Section 388.

Following discovery and a fully developed record, Springs moved for summary judgment based on: (1) the lack of any evidence Springs owed a duty to Stuart under either the common law or Section 388; (2) evidence that Springs had reason to believe the users of the forklift would realize its dangerous condition in the event Section 388 applies; (3) the bar against Stuart's recovery contained in Section 15-73-20 of the South Carolina Code based on Stuart's awareness of the danger and unreasonable use of the forklift; and (4) Stuart's assumption of the risk and overwhelming negligence which far exceeds any negligence on the part of Springs.

In granting summary judgment to Springs, the District Court concluded that Springs was not liable for creating the risk of harm in the absence of any evidence

that Springs installed or modified the ROPS or that any modification increased the risk of harm.  The Court also concluded Springs did not owe a duty to Stuart under Section 388, assuming that section applies to donors.  Stuart now appeals the Order Granting Summary Judgment to Springs.

## STATEMENT OF THE FACTS

When Springs donated the Manufacturing Services Center and land to the City of Lancaster, the purpose of the donation was to provide land and a building the City could use for the benefit of the public, as a training facility for city employees or a 911 dispatch center.  (App. pp. 143-45.)  A deed was executed for the donation, which conveyed ownership of the property from Springs to the City for consideration of ten dollars.  (App. pp. 143, 145.)  Prior to the donation, Springs' Director of Purchasing, Planning and Real Estate, Ron Lordo, walked through the property with Lancaster's City Administrator, Steve Willis, to view the building, which included desks and chairs which could be used by the City and other items which would be disposed of by the City.  (App. pp. 143-46.) Equipment or other items in the building, including the forklift, were left for the City to dispose of as it saw fit in a manner that would benefit the City.  (App. pp. 144, 146.)

The City's Administrator, Helen Sowell, and Risk Manager, Tim Harper, acknowledged the forklift was included in a significant amount of property that

was left in the building when the building was transferred to the City. (App. pp. 165, 173.) There is no indication from Sowell or Harper that either individual examined the donated forklift or otherwise inspected its condition and safety before allowing Stuart, a City employee, to operate the forklift. Consequently, neither Sowell nor Harper were aware of the obvious absence of a seatbelt or other restraint system on the forklift. (App. pp. 166, 174.) Both claim that action would have been taken to correct the forklift or prevent its use if they had been aware of the lack of any seatbelt/operator restraint system. (*Id*.)

When Stuart's accident occurred, he had been instructed by the Lancaster City Administrator to get tables ready for pick up by an individual (App. p. 87.) Prior to using the forklift to move the tables, Stuart had used the forklift in question up to five or six times over the course of a few weeks. (App. pp. 91, 96, 108.) He also witnessed the forklift being operated on a number of occasions prior to his accident. (App. p. 96.) Having been to the building on a regular basis before his accident, Stuart knew the items in the building were owned by the City. (App. pp. 93, 96, 97.) In fact, Stuart considered the forklift to be property of the City. (App. p. 98.) Prior to operating the forklift, Stuart did not ask anyone about any inspection of the forklift and relied on the City to make sure the forklift was safe and suitable for operation. (App. p. 100.) In Stuart's opinion, the City had the knowledge and expertise to make sure any equipment, such as the forklift, was

completely safe before allowing City employees to use it.  (App. p. 102.)  Indeed the City was required to correct obvious safety deficiencies and provide a hazard-free work environment to its employees pursuant to OSHA regulations.  (App. pp. 143, 145.)

Prior to working for the City of Lancaster Fire Department, Stuart was employed as a utility construction foreman.  (App. p. 56.)  In this position, Stuart operated heavy equipment including a yard forklift (a bigger piece of equipment than a regular forklift) and an excavator.  (App. p. 57.)  He received training on safely operating this equipment including maneuvering techniques and the danger of slopes, the use of safety equipment such as seatbelts and hard hats, and avoiding tipping or rolling over.  (App. pp. 58-62.)  As part of his training, Stuart also learned to inspect the equipment prior to each operation including checking the brakes, the roll bar, and the seatbelts.  (App. pp. 64-66.)  Because he appreciated the importance of conducting inspections, Stuart tried to conduct an inspection each time he used equipment.  (App. p. 67.)

Stuart also worked for Coca-Cola for five years where he used a forklift and received a forklift certification.  (App. pp. 68-70.)  In addition to teaching him how to safely operate a forklift, including operation on inclines and during brake failure, the certification program taught him to wear a seatbelt when operating the

forklift.  (App. pp. 71, 72, 76.)  Stuart was aware of the hazards of operating a forklift.  (App. p. 72.)

Before using the forklift, Stuart performed only a quick walk around inspection due to a "time crunch."  (App. p. 102.)  This included checking the tires, fittings, and brakes.  (App. pp. 102, 103.)  Despite knowing that forklift parts could break down if the forklift sat idle for years, Stuart failed to conduct a full inspection to assure it was in a good, safe condition before using it.  (App. pp. 105, 106.)  Stuart also observed the absence of seatbelts on the forklift.  (App. pp. 103, 104.)  According to Stuart, the lack of a seatbelt was an obvious condition.  (App. p. 111.)

Stuart received prior training on the importance of wearing a seatbelt during forklift operation to keep from falling off the forklift.  (App. pp. 104, 105.)  Stuart suggested to his superiors with the City that the forklift needed a seatbelt.  (App. pp. 109.)  Despite the fact the City did not provide a seatbelt, Stuart chose to operate the forklift, knowing it was dangerous.  (*Id*.)  Stuart specifically testified:

Defense Counsel:  You knew there were no seatbelts before you ever got on the forklift?

Stuart:  Yes.

Defense Counsel:  Did you feel that was a danger?

Stuart:  Yes, I did, at the time.

Defense Counsel:  Did you object to getting onto the forklift?

| | |
|---|---|
| Stuart: | No. |
| Defense Counsel: | But you got on the forklift and operated it with full knowledge that there were no seatbelts present? |
| Stuart: | That's correct… |
| Defense Counsel: | So, would you agree that you knew there's a danger of falling off the forklift if you are not wearing a seatbelt? |
| Stuart: | Yes. |
| Defense Counsel: | You decided to operate the forklift anyway? |
| Stuart: | At the time, yes. |

(App. pp. 104, 105.)  Not only did Stuart appreciate the danger of operating the forklift without a seatbelt, he conceded that no further warning would have impacted his decision to use the forklift:

| | |
|---|---|
| Defense Counsel: | If someone said to you, "You could fall off this forklift because it does not have a seatbelt," that's something you already knew, correct? |
| Stuart: | From, yeah, my training, yes. |
| Defense Counsel: | If someone said to you, "You could be thrown from this forklift if it starts to fall because it does not have a seatbelt," that's something you already knew, correct? |
| Stuart: | That's correct. |
| Defense Counsel: | Is there a warning that someone could have given you about the lack of seatbelts that would've made you know any more about the dangers that it posed? |
| Stuart: | Probably not. |

(App. pp. 110, 111.)

Fully aware of the danger of the obvious absence of a seatbelt, Stuart operated the forklift at the direction of the City Administrator, Helen Sowell. While loading tables with the forklift, the brakes failed and the forklift rolled down the sloped parking lot, eventually becoming airborne, flipping, and pinning Stuart. (App. pp. 120-23.)

## SUMMARY OF ARGUMENT

The District Court did not err in granting summary judgment to Springs because there is no evidence Springs owed Stuart a duty of care. South Carolina has not adopted Restatement (Second) of Tort § 388 outside of the products liability arena and there is no indication it would apply section 388 to a case involving a donation. Should this Court determine South Carolina would apply section 388 to the instant case, the sophisticated user doctrine of subpart (b) limits Springs' liability. There is also no basis for a duty under either South Carolina statutory or common law when Springs did not create the risk of harm and when Stuart assumed the risk of operating a forklift he knew was dangerous.

## **STANDARD OF REVIEW**

The Court of Appeals reviews the decision granting summary judgment by the same standard applied by the district court. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if there is no genuine issue of material fact. There is no genuine issue of material fact if the plaintiff fails to provide evidence necessary to support his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986); *Drewitt v. Pratt*, 999 F. 2d 774, 776 (4th Cir. 1993).

If the plaintiff fails to produce evidence on an essential element of his case, all other factual questions are immaterial. The United States Supreme Court in the *Celotex* case held as follows:

> The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23, 106 S. Ct. at 2552 (emphasis added). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

# ARGUMENT

## I)  SUMMARY JUDGMENT SHOULD BE AFFIRMED WHEN THERE IS NO EVIDENCE SPRINGS OWED STUART A DUTY OF CARE.

Springs does not owe a duty to Stuart under Restatement (Second) of Torts § 388 which states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a)  knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b)  has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c)  fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

In granting summary judgment to Springs, the District Court assumed without deciding that the South Carolina Supreme Court would apply section 388 to donors.  Even though Springs is entitled to summary judgment under this assumption, the fact remains that South Carolina has never adopted or applied section 388 outside of the products liability arena.  No South Carolina court or South Carolina statute has ever mentioned comment c[1] to that section or the similar

---

[1]  Comment c states: "Persons included as 'suppliers.' The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession

section 405[2] to expand the duties enumerated in Section 388 to donors, a step that would have a chilling effect on charitable donations in the state, particularly in, but not limited to, the realm of kidney car donations. It would further extend currently unrecognized duties to transactions on the secondary market, such as garage sales and online auctions, thus economically crippling the free exchange of goods past the initial purchase from a manufacturer or seller. South Carolina courts have not been willing to extend sections 388 or 405 to such transactions, and the State limits even section 402A[3] and other products liability cases to sellers who regularly

---

or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, irrespective of whether the bailment is for a reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safekeeping, or repair. They also apply to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it."

[2] Section 405 states: "One who directly or through a third person gives or lends a chattel for another to use, knowing or having reason to know that it is or is likely to be dangerous for the use for which it is given or lent, is subject to the same liability as a supplier of the chattel."

[3] Section 402A (1965) is codified in S.C. Code Ann. §§ 15-73-10, -20, and -30, and states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

engage in sales of the product. This limitation of liability to a particular subset of sellers shows that South Carolina is unwilling to expand duties of sellers under sections 388 or 405 to situations such as the present, where the Defendant is not engaged in the business of selling forklifts. Until the legislature changes the current law to adopt this additional duty for donors, South Carolina courts should not and would not adopt the duty either. Of note, the only comment ever adopted with respect to South Carolina (in an unpublished opinion by this Court) is comment n, which provides clarification on how the duty is further limited for bulk suppliers, an indication that section 388 only applies to limited circumstances in South Carolina, all within the products liability field. *See Coffey v. Chem. Specialties, Inc.*, No. 92-2397, 1993 WL 318886 (4th Cir. Aug. 20, 1993). The present case is not the proper arena for creation of a new duty on donors of property or those who resell goods outside the context of sellers engaged in the business of selling a particular product.

---

(a) the seller has exercised all possible care in the preparation and sale of his product,
   and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

13

## II) EVEN IF SECTION 388 IMPOSES A DUTY ON SPRINGS, THE SOPHISTICATED USER DEFENSE OF SUBSECTION (B) LIMITS SPRINGS' LIABILITY.

### A) SPRINGS HAD REASON TO BELIEVE THE CITY WOULD REALIZE THE FORKLIFT'S DANGEROUS CONDITION.

Should this Court determine South Carolina would extend section 388 beyond products liability cases to donors, subsection (b) limits Springs' liability. Pursuant to section 388(b), liability is limited to suppliers who have "no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition." Springs is not subject to liability under section 388 because it had reason to believe that the City and the City's employees, including Stuart, would realize the forklift's dangerous condition. *See O'Neal v. Celanese Corp.*, 10 F.3d 249, 251 (4th Cir. 1993) (applying sophisticated user defense in action brought by employee of buyer of factory equipment because supplier reasonably relied upon the intermediary to warn users); *Bragg v. Hi-Ranger*, 462 S.E.2d 321, 332 (S.C. Ct. App. 1995) (recognizing the sophisticated user doctrine as part of products liability law in South Carolina).

In *O'Neal v. Celanese Corporation*, this Court explained the sophisticated user defense as adopted by Maryland Courts in products liability cases:

> [I]n alleged negligent failure to warn situations … if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger by either warning its employees or otherwise providing

the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the danger associated with the product, no warnings are mandated.

Relying on *O'Neal*, the South Carolina Court of Appeals recently held in a products liability action that "the sophisticated user doctrine applies when there is evidence the seller of a product was aware that an intermediate purchaser understood the dangers associated with the product and had the ability to effectively communicate those dangers to the end user." *Lawing v. Trinity Mfg., Inc.*, 749 S.E.2d 126, 132-33 (S.C. Ct. App. 2013). This Court enumerated six factors based on comment (n) to section 388 to be considered in determining whether a supplier reasonably relied on the intermediary to warn users of a dangerous product: (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability for the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users. *O'Neal*, 10 F.3d at 252. Although these factors most logically apply in a products liability setting, their consideration is instructive in the instant case.

First, applying these factors to the instant case and citing the District Court, "the risk of harm was the risk posed by the presence of any ROPS without a corresponding operator restraint system such as a seatbelt." (App. p. 290.) As the

District Court noted, "the absence of a seatbelt was obvious." (App. p. 294.) According to Stuart, the lack of a seatbelt was an obvious condition. (App. p. 111.) Stuart recognized the absence of a seatbelt before he got on the forklift and appreciated the danger it posed, particularly the danger of falling off the forklift. (App. pp. 104-05.)

Second, while the obvious use of a forklift is to lift objects, there is no evidence Springs had any knowledge about whether or how the City would use the forklift. Springs believed the purpose of the donation was to provide land and a building the City could use for the benefit of the public, as a training facility for city employees or a 911 dispatch center. (App. pp. 143-45.) Whether the City would use the contents of the building or discard them was left to the City's discretion.

Third, there is no evidence regarding the form of any warnings given. Based on this Court's analysis in *O'Neal*, the failure to warn of obvious dangers is reasonable. In *O'Neal*, the supplier provided warnings regarding specific chemicals and hazardous materials which were unique to the facility conveyed to the buyer. *O'Neal*, 10 F.3d at 253-54. However, the supplier did not warn the buyer of the danger of lead based paint because it assumed the buyer, with its extensive experience, would take whatever precautions were commonplace in its trade, such as providing safety equipment to its employees. *Id*. at 253. According

to this Court, it was reasonable for the supplier to assume the experienced buyer would, for example, provide welding hoods for its welders or safety belts for workers required to work in high areas. *Id*.

Similarly, it was reasonable for Springs to assume the City, a large and sophisticated employer, would recognize obvious dangers and provide safety equipment to its employees. (App. pp. 143, 145.) As noted by the District Court, there is no evidence Springs would not have assumed the City was obligated to comply with OSHA regulations – "at least to the extent of correcting an obvious safety deficiency prior to using the abandoned property." (App. p. 293.) In fact, the City was cited with a safety violation by the South Carolina Department of Labor, Licensing and Regulation after Stuart's accident for "failing to furnish a place of employment which is free of recognized hazards which may cause death or serious physical harm to its employees." (App. p. 165.) The citation also notes that the "employer knew or should have known that employees operating a Clark forklift, model CF20, without wearing a seatbelt [were] exposed to a tipover hazard and being crushed." (App. p. 171.)

Not only was the City obligated to follow safety regulations, it was also required to abide by employment law, which would include having only trained and experienced forklift operators using a forklift in the employment context. The City abided by this requirement, as expected by Springs, by having Stuart, a

certified forklift operator who had extensive prior training and experience in forklift safety and operation, using the forklift. (App. pp. 68-70.) He received training on the importance of wearing a seatbelt during forklift operation to keep from falling off the forklift. (App. pp. 104, 105.)

Fourth, the sophistication of the City and its obligation to follow safety regulations and employment law also make it a reliable conduit of necessary information regarding the dangerous product. In fact, as noted above, Stuart relied on the City to provide a safe and operable forklift for his use. In Stuart's opinion, the City had the knowledge and expertise to make sure abandoned equipment, such as the forklift, was completely safe before allowing City employees to use it. (App. p. 102.) It was reasonable for Springs to rely on the City to warn its employees of the dangers of using the forklift when both Sowell and Harper testified they "would have ensured … that the hazard was corrected or that the lift truck was locked away from potential use by employees or others" if they had known the forklift was not equipped with seatbelts. (App. pp. 166, 174.)

Fifth, the magnitude of the risk was recognized by the City. As the District Court noted, "the affidavits of Sowell and Harper establish beyond dispute that two City officials who were responsible for and able to control such matters understood that a missing seatbelt posed a serious risk to safety." (App. p. 294.) Although their affidavits establish they did not know or realize the forklift lacked

a seatbelt, a "cursory visual inspection of the forklift" would have informed them of this obvious defect.  (App. p. 294.)

Sixth, the burden imposed on Springs to warn all users is unreasonably great.  Like the supplier in *O'Neal* who sold a number of buildings and pieces of equipment for a large sum of money, Springs donated a building full of miscellaneous items and equipment to the City.  As noted by this Court in *O'Neal*, "the contents of an entire factory obviously does not lend itself to the typical warning label."  *O'Neal*, 10 F.3d at 254.  Like the supplier in *O'Neal*, "[i]t simply would not have been at all feasible for [Springs] to place a warning label on each and every piece of equipment to warn of the possible dangers that may arise in trying to salvage that equipment."  *Id.*

Based on these six factors and considering both the obviousness of the absence of a seatbelt and the danger posed, Springs certainly had reason to believe the City would realize the forklift's dangerous condition.  There is no evidence to defeat section 388(b)'s bar to the extension of a duty to warn.  The limitation of section 388(b) applies in the event South Carolina courts would apply section 388 outside of the products liability context.

### B) THE BURDEN OF PROVING THE INAPPLICABILITY OF THE SOPHISTICATED USER DEFENSE RESTS ON STUART.

The application of section 388 and its sophisticated user doctrine to the instant case is questionable because this is a not a products liability case.  As noted

by the District Court, cases analyzing the sophisticated user doctrine such as the South Carolina Court of Appeals' decision in *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321 (S.C. Ct. App. 1996), are distinguishable because they involve "typical products liability claims, with the duty arising from the defendants' role in manufacturing or selling the product." (App. p. 291.) In this case, the duty at issue arises solely from section 388. Therefore, the general application in products liability cases of the sophisticated user doctrine as an affirmative defense has no basis in this case.

Stuart correctly argues that the subparts of section 388 are treated as affirmative defenses in product liability cases. He cites a number of products liability cases[4] in support of his argument but fails to provide any reason for departing from the District Court's application of section 388(b) outside of the products liability arena. The District Court correctly held that when the duty arises solely from section 388, the burden of proving all elements under section 388 are satisfied rests on the party seeking to impose the duty. This conclusion is based on the plain language of section 388. In interpreting 388, the District Court correctly determined that by using the word "if" instead of the word "unless" before the three subparts, the drafters of the Restatement intended to require proof of the

---

[4] Among the products liability cases cited, Stuart also cites 63A Am. Jur. 2d Products Liability § 1215 "Driving while intoxicated or at excessive speeds." It is unclear how this citation applies to the instant case.

circumstances both preceding and following "if". If the initial clause imposed a duty with the three subparts acting as a defense, the word "unless" would have been used.

Although the District Court correctly held the burden of proving the subparts of section 388 rests on Stuart, affirming this holding is not necessary to affirming summary judgment for Springs. Regardless of where the burden rests, there is no evidence that Springs had reason to believe the City would fail to realize the forklift's dangerous condition. As explained in the preceding section and held by the District Court, the evidence establishes the danger of the absence of a seatbelt was "readily apparent to any observer" and that responsible City officials and Stuart himself understood the absence of a seatbelt presented a danger. (App. p. 293.) The sophisticated user doctrine limits Springs' liability and warrants an order affirming summary judgment for Springs.

### III) SUMMARY JUDGMENT FOR SPRINGS SHOULD BE AFFIRMED BASED ON SOUTH CAROLINA STATUTORY AND COMMON LAW WHICH PROVIDES NO BASIS FOR IMPOSING LIABILITY.

#### A) SOUTH CAROLINA COMMON LAW DOES NOT PROVIDE ANY BASIS FOR A DUTY OWED BY SPRINGS TO STUART.

Neither section 388 nor South Carolina common law provides a basis for imposing a duty on Springs. "An essential element in a cause of action based on negligence is the existence of a legal duty of care owed by the defendant to the

plaintiff.  Without a duty, there is no actionable negligence."  *Oblachinski v. Reynolds*, 706 S.E.2d 844, 845-46 (S.C. 2011).  Stuart has the burden to establish a duty of care owed because the common law knows no general duty to act.  *Trask v. Beaufort County*, 709 S.E.2d 536, 539 (S.C. Ct. App. 2011).  "The mere fact that [a plaintiff's] injuries may have been foreseeable does not create a duty to prevent those injuries."  *Bauer v. United States*, 882 F.Supp. 516, 519 (D.S.C. 1995).  "For negligent conduct to become actionable, it must violate some specific legal duty owed to Plaintiffs."  *Id.*

The South Carolina Supreme Court has been still more specific in stating how duties are created rather than naturally existing.  *See McCullough v. Goodrich & Pennington Mortgage Fund, Inc.*, 644 S.E.2d 43, 46 (S.C. 2007).  "In order for liability to attach based on a theory of negligence, the parties must have a relationship recognized by law as providing the foundation for a duty to prevent an injury."  *Id.*  Such duty can be created in one of five enumerated ways: statute, contractual relationship, status, property interest, or some other special circumstance.  *Id.*  But the law "will not extend the concept of a legal duty of care in tort liability beyond reasonable limits."  *Id.*

The District Court correctly held that there is no evidence to support the imposition of a common law duty based on Stuart's contention that Springs created the risk of harm.  According to Stuart's own expert, the risk of harm posed by

22

having a ROPS without a seatbelt was not created by Springs, but by the original manufacturer of the forklift. Stuart's expert concedes the forklift was originally sold with a ROPS and without a seatbelt in 1966 to an entity other than Springs. (App. pp. 161, 162.)

There is also no evidence that Springs modified the ROPS in a manner which made it more dangerous. Stuart's expert suggests the ROPS in place at the time of Stuart's accident was not the same ROPS that was originally installed by the manufacturer based on differences in the shape of the steel tubing and the use of welds as an attachment method. (App. p. 163.) In his brief, Stuart contends the ROPS was modified "by Springs or at its direction." (Appellant's Brief p. 5.) This is a misrepresentation of the facts. As the District Court correctly notes, the misrepresentation contradicts Stuart's own expert who suggests that "Springs Industries *or one of its predecessors* replaced the original [manufacturer's] overhead guard." (App. p. 163, emphasis added.) Regardless of who modified the ROPS between when it was sold to Springs' predecessor in 1966 and when it was transferred to the City in 2005, there is no evidence such modification caused Stuart's injuries or increased the risk of harm. According to Stuart's expert, the danger was the presence of any ROPS, modified or not, coupled with the absence of a seatbelt. (App. pp. 162, 163.) As previously noted, that danger was present

from the time of the original sale of the forklift from the manufacturer to Springs' predecessor.

Not only is the record devoid of any evidence Springs created a risk of harm, it also lacks any evidence supporting a duty based Stuart's relationship with Springs. When his accident occurred, Stuart had worked for the City of Lancaster as a firefighter for about seven years. (App. p. 27.) Springs donated a building to the City of Lancaster several years before Stuart began using the subject forklift. (App. pp. 143, 145.) In Stuart's capacity as a City employee, he spent time in the donated building and understood the building and its contents, including the forklift, were owned by the City. (App. pp. 93, 98.) In fact, Stuart knew the City owned the building two years before his accident occurred. (App. p. 91.) He had no knowledge of how the building or its contents came to be owned by the City. (App. pp. 91, 92.) The times Stuart visited the building were at the instruction of his employer to complete tasks for the benefit of the City, plus an additional visit with his "whole shift" to look around out of curiosity. (App. pp. 92, 95, 96, 100.) Visits to a building donated by Springs five years prior to the accident, do not establish a cognizable relationship between Springs and Stuart. As the *Bauer* opinion stated in its view of the South Carolina common law on what constitutes an actionable legal duty, "this relationship is too attenuated to create a legal duty toward Plaintiffs." *Bauer*, 882 F.Supp. at 520.

## B) SOUTH CAROLINA BARS RECOVERY BECAUSE STUART WAS AWARE OF THE DANGER AND PROCEEDED UNREASONABLY TO MAKE USE OF THE FORKLIFT.

As detailed above, Stuart understood and appreciated the danger of using the forklift without a seatbelt and chose to operate the forklift despite such danger. Under S.C. Code Ann. § 15-73-20, Stuart's recovery is barred: "If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

Stuart admitted he knew the forklift did not have a seatbelt. (App. p. 103.) Based on his prior training, Stuart knew it was important to wear a seatbelt during forklift operation to keep from falling off the forklift. (App. pp. 104, 105.) Stuart suggested to his superiors with the City that the forklift needed a seatbelt, and even though the City did not provide a seatbelt, Stuart chose to operate the forklift on multiple occasions, knowing it was dangerous. (App. p. 109.) Stuart's injury was caused by the very danger Stuart recognized and willfully ignored, the lack of a seatbelt.

There is no dispute Stuart discovered the absence of a seatbelt on the forklift, proceeded unreasonably to make use of the forklift and was injured by it. Pursuant to section 15-73-20, he is barred from recovery.

## C) STUART'S ASSUMPTION OF THE RISK AND OVERWHELMING NEGLIGENCE FAR EXCEEDS ANY NEGLIGENCE ON THE PART OF SPRINGS.

South Carolina common law echoes the statute above. Assumption of the risk requires four elements: "(1) the plaintiff must have knowledge of the facts constituting a dangerous condition; (2) the plaintiff must know the condition is dangerous; (3) the plaintiff must appreciate the nature and extent of the danger; and (4) the plaintiff must voluntarily expose himself to the danger." *Davenport v. Cotton Hope Plantation Horizontal Prop. Regime*, 508 S.E.2d 565, 569 (S.C. 1998). Free and voluntary exposure by the Plaintiff to a danger he knows and understands warrants a grant of judgment as a matter of law. *See Ervin v. Cont'l Conveyor & Equip. Co., Inc.*, 674 F.Supp.2d 709, 723 (D.S.C. 2009). "In a case in which 'evidence of the plaintiff's *greater* negligence is overwhelming, evidence of slight negligence on the part of the defendant is simply not enough for a case to go to a jury.'" *Id.* at 722 (quoting *Bloom v. Ravoira*, 529 S.E.2d 710, 713 (S.C. 2000)). The court may bar recovery by the plaintiff "as a matter of law where the degree of fault arising from the plaintiff's assumption of risk exceeds any negligence on the part of the defendant." *Singleton v. Sherer*, 659 S.E.2d 196, 207 (S.C. Ct. App. 2008) (citing *Bloom*, 529 S.E.2d at 713; *Estate of Haley v. Brown*, 634 S.E.2d 62, 63 (S.C. Ct. App. 2006); *Hopson v. Clary*, 468 S.E.2d 305, 308 (S.C. Ct. App. 1996)).

Stuart admitted that he knew the forklift had no seatbelt, knew the absence of a seatbelt caused the forklift to be dangerous, knew the absence of the seatbelt could allow someone to fall off the forklift and be injured, and voluntarily operated the forklift despite this knowledge. With his forklift certification and extensive training and experience in the operation of forklifts, he recognized the importance of wearing a seatbelt during forklift operation to keep from falling off the forklift. (App. pp. 68-70, 104, 105.) According to Stuart, he appreciated the danger posed by the absence of seatbelts and chose to operate the forklift despite such knowledge. (App. p. 104.) Despite the fact the City did not provide a seatbelt even after Stuart suggested to his superiors one was needed, Stuart chose to operate the forklift, knowing it was dangerous. (App. p. 109.) Stuart fails to allege that he would have changed his behavior had he become aware of the absence of seatbelts. *See Sewell v. Wrap-On Co., Inc.*, No. 92-1720, 1993 WL 18329, at *8 (4th Cir. Jan. 29, 1993) (unpublished opinion requiring allegations that the Stuart would have changed behavior had he known of a defective condition in a product). He also concedes that no warning would have impacted his decision to use the forklift. (App. pp. 110, 111.)

Additionally, a forklift operator is required to inspect the forklift before each use. Although Stuart knew he was required to conduct an inspection before operating the forklift, he failed to inspect the forklift each time he used it. (App. p.

108.)  Despite knowing the importance of pre-trip inspections, Stuart conducted only a quick walk around prior to operating the forklift even though he knew forklift parts such as brakes could break down if the forklift sat idle for years. (App. pp. 102, 105, 106.)  Stuart failed to ask anyone about any inspection of the forklift and relied on the City to make sure the forklift was safe and suitable for operation.  (App. p. 100.)  By these admissions, he satisfies every *Davenport* element.

As in *Singleton*, Stuart "freely and voluntarily exposed himself to a known danger which he understood and appreciated."  *Singleton*, 659 S.E.2d at 208. There is no dispute that Stuart's negligence outweighed any negligence by Springs which abandoned a forklift along with many other items within a building it donated for the benefit of the City of Lancaster.  The City agreed to dispose of the contents of the building.   Any factual issues of negligence on the part of Springs "cannot alter the inescapable conclusion [Stuart's] negligence exceeded fifty percent."  *Id.* Stuart's negligence exceeds Springs' negligence as a matter of law, thereby meriting summary judgment in Springs' favor.

## CONCLUSION

Should this Court determine South Carolina would apply Restatement (Second) of Torts § 388 outside of the products liability arena, the sophisticated user doctrine of subpart (b) limits Springs' liability.  The lack of any duty owed by

Springs to Stuart is also supported by both South Carolina statutory and common law.  Based on the arguments above, the District Court's Order granting summary judgment in Springs' favor should be affirmed.

Respectfully submitted,

MURPHY & GRANTLAND, P.A.

*s/ Ronald B. Diegel*
Ronald B. Diegel, Esq., Fed. I.D. No.: 5827
Peter E. Farr, Esq., Fed. ID No.: 9709
Ashley B. Stratton, Esq., Fed ID No.: 10508
4406-B Forest Drive
PO Box 6648
Columbia, South Carolina 29260
(803) 782-4100
**Attorneys for Defendant Springs Industries, Inc.**

January 23, 2014

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.  This brief complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

    The word count of this brief is <u>6,937 words</u>.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    This brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word, Times New Roman, 14 point</u>.

January 23, 2014

                           <u>/s/ *Ronald B. Diegel*</u>
                            Ronald B. Diegel, Esq.

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this January 23, 2014 filed the required copies of the foregoing Response Brief of Appellee in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellee using the Court's CM/ECF system which will send notification of such filing to the following counsel:

David B. Marvel
PRENNER MARVEL, PA
636 King Street
Charleston, South Carolina 29401
dave@prennermarvelcom

January 23, 2014

/s/ *Ronald B. Diegel*
 Ronald B. Diegel, Esq.

**ADDENDUM TO BRIEF OF APPELLEE**

**SUBMITTED IN COMPLIANCE WITH FRAP 28(F) AND 32.1(B)**

**4 F.3d 984**
**Unpublished Disposition**
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals,
Fourth Circuit.

Jerry G. COFFEY, *Plaintiff-Appellant,*
v.
CHEMICAL SPECIALTIES, INCORPORATED,
*Defendant-Appellee,*
and
WOOD TREATING EQUIPMENT COMPANY,
INCORPORATED, *Defendant,*
v.
PENNWALT CORPORATION; Tennessee
Chemical Company; Diamond Shamrock Refining
Marketing Company; Occidental Chemical
Corporation; Atochem North America,
Incorporated, *Third Party Defendants.*

No. 92-2397. | Argued: May 6, 1993. | Decided:
August 20, 1993.

Appeal from the United States District Court for the
District of South Carolina, at Orangeburg. Dennis W.
Shedd, District Judge. (CA-88-479-6)

**Attorneys and Law Firms**

Argued: Kenneth Michael Suggs, Suggs & Kelly,
Lawyers, P.A., Columbia, South Carolina, for Appellant.

Timothy William Bouch, Young, Clement, Rivers &
Tisdale, Charleston, South Carolina, for Appellee.

On Brief: Stephen P. Groves, H. Michael Bowers, Young,
Clement, Rivers & Tisdale, Charleston, South Carolina,
for Appellee.

D.S.C.

AFFIRMED.

Before HALL and WILKINS, Circuit Judges, and KISER,
Chief United States District Judge for the Western District
of Virginia, sitting by designation.

**Opinion**

**OPINION**

KISER, Chief District Judge:

## I.

**\*1** Jerry Coffey appeals the lower court's order granting
summary judgment in favor of Chemical Specialties Inc.
(CSI). Finding no error with the lower court's decision,
we affirm.

## II.

From 1981 through 1986, the plaintiff/appellant, Jerry
Coffey, was employed as a plant manager by Holly Hill
Forest Industries Inc. (Holly Hill), a pressurized wood
treating company. Holly Hill's wood treating process
involved the use of a pressurized container to treat lumber
with a wood preservative known as Chromated Copper
Arsenate (CCA), which is a mixture of copper sulfate,
sodium bichromate and arsenic acid. In March 1982,
Holly Hill began purchasing a 50% concentration of CCA
from the defendant/appellee, CSI. In July 1982, Holly Hill
decided to mix its own CCA compound and started
purchasing the aforementioned chemicals directly from
CSI. CSI generally shipped the chemicals by tanker truck
to Holly Hill and only rarely shipped the chemicals in
bags by trailer truck.

From 1982 through 1986, Coffey was actively involved in
mixing the constituent chemicals to form the CCA
compound. His duties included mixing the appropriate
proportion of chemicals with water and cleaning
(crapping out) the tank after the CCA preservative had
been formed. As a result of this exposure, Coffey alleges
that he suffered serious health problems. In January 1988,
Coffey filed suit against CSI, alleging a number of claims
including negligence, breach of warranty and strict
liability due to CSI's alleged failure to warn him of the
dangers of being exposed to the chemicals.

CSI filed a motion for summary judgment asserting that,
as a bulk supplier, it had complied with its duty to warn
by providing Holly Hill with adequate precautionary
information about the chemicals it sold. In support of its
motion, CSI submitted the affidavit of H.M. Lupold, the

former president and part-owner of Holly Hill, who stated that CSI regularly sent him and supervisory plant personnel Material Safety Data Sheets (MSD Sheets) and other warnings pertaining to the handling of the chemical compounds. J.A. at 232. CSI also submitted deposition testimony from Michael Jordan, CSI's maintenance superintendent, and John Fretti, CSI's technical director, stating that both conveyed these warnings to Holly Hill and its employees. J.A. at 194-98, 209-10.

Coffey submitted his own affidavit challenging Lupold's contention that CSI sent MSD Sheets to Holly Hill. Coffey asserted that he was in a position to have seen the MSD Sheets and that since he did not see them, the sheets must have never been transmitted to Holly Hill. J.A. at 294-95. Coffey further stated that while CSI provided warnings regarding the need to wear certain protective gear, he was never warned of the need to wear a dust respirator when working with the chemicals.[1] Coffey asserts that on at least one occasion, CSI employees witnessed him wearing an inadequate paper mask and made no effort to warn him of the need to wear a dust respirator.

**\*2** The lower court granted CSI's motion for summary judgment, concluding that CSI had transmitted the necessary MSD Sheets to Holly Hill despite Coffey's claim that he had never seen them. The court then concluded that a South Carolina court, if faced with the issue, would recognize the bulk supplier defense set forth in Comment "n" of Section 388 of the *Restatement (Second) of Torts* and would conclude that CSI had satisfied its duty to warn by providing Holly Hill with the MSD Sheets. J.A. at 296.

Coffey raises three issues on appeal. First, he asserts that a genuine issue of material fact exists regarding whether or not CSI sent MSD Sheets to Holly Hill. Second, Coffey argues that the court erred in deciding that a South Carolina court would adopt the bulk supplier defense. Third, Coffey contends that even if a South Carolina court would adopt the bulk supplier defense, the district court erred in applying the defense to this case.

### III.

Rule 56(c) provides that a moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). While the appellate court must draw all reasonable inferences in the light most favorable to the nonmoving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962), the nonmoving party may not create a general issue of material fact based on mere speculation or the building of one inference upon another. *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985).

Coffey contends that there is a genuine issue of material fact as to whether CSI transmitted MSD Sheets to Holly Hill. Coffey claims that as a member of the supervisory plant personnel, he was in a position to have seen the MSD Sheets and that since he did not see them, they must have never been sent to Holly Hill. Coffey maintains that his affidavit directly contradicts the statements made by Lupold, Jordan and Fretti and that the lower court improperly conducted a credibility assessment by favoring their statements and rejecting his affidavit. Coffey also questions the probative value of CSI's evidence in light of his contention that on at least one occasion, CSI employees witnessed him wearing a paper mask when working with the chemicals and made no effort to warn him of the inadequacy of the mask and the need to wear a dust respirator.

In opposing CSI's motion for summary judgment, Coffey has undertaken the difficult burden of attempting to prove a negative-that Holly Hill never received MSD Sheets from CSI. As the district court correctly noted, in an effort to prove this negative, Coffey attempts to deny an act to which he was not a party. Lupold, as president of Holly Hill, stated unequivocally that he received MSD Sheets from CSI regularly over the years in question. Jordan and Fretti, two CSI employees, corroborated Lupold's statements and stated that they conveyed both written and oral warnings to Holly Hill employees in the form of MSD Sheets and demonstrations.

**\*3** At best, Coffey's statements establish that he personally did not receive the MSD Sheets which contained information about the chemicals and included recommendations for protective gear (i.e. dust respirators). Coffey's statements are not, however, probative of whether *Holly Hill* received these warnings from CSI. While Coffey may testify as to whether he received MSD Sheets at Holly Hill, he has failed to establish any foundation to support his bold assertions that no one else (i.e. Lupold) at Holly Hill received MSD Sheets. Coffey's self serving testimony which is utterly lacking in foundation does not establish a genuine issue of material fact. Accordingly, we agree with the district court that no factual issue exists with regard to this matter.[2]

## IV.

Pursuant to section 388 of the *Restatement (Second) of Torts,* a supplier is liable when it: (a) supplies a defective or dangerous product; (b) has no reason to believe that the user will realize its dangerous condition and (c) cannot reasonably rely upon the purchaser/employer to supply the necessary warnings to the ultimate users of the product. *See Goodbar v. Whitehead Bros.,* 591 F. Supp. 552, 556 (W.D. Va. 1984), *aff'd sub. nom., Beale v. Hardy,* 769 F.2d 213 (4th Cir. 1985). Comment "n" of section 388, which addresses the third factor in this test, recognizes that in certain circumstances, a bulk supplier of a dangerous product may satisfy its reasonable care requirements by notifying the purchaser (Holly Hill) of the dangers of the product rather than directly notifying the ultimate users (Coffey) of the product. *Id.; Restatement (Second) of Torts § 388* cmt. n (1965).

The *Goodbar* court listed a number of factors that may be considered before the bulk supplier defense may be invoked. These factors include: (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved and (6) the burdens imposed on the supplier by requiring that it directly warn all users. *Goodbar,* 591 F. Supp. at 557.

While neither the South Carolina legislature nor the South Carolina courts have expressly adopted comment "n" to section 388, we disagree with Coffey that this absence of specific authority presents an impenetrable barrier to our decision on the viability of the bulk supplier defense in this case. The district court, while relying upon "admittedly wavering guidance" from state law, concluded that a South Carolina court facing the issue would recognize the bulk supplier defense. We agree with this assessment.

In *Livingston v. Noland Corp.,* 293 S.C. 521, 525, 362 S.E.2d 16, 18 (1987), the Supreme Court of South Carolina implicitly recognized section 388 of the *Restatement* when it stated:

> A supplier and manufacturer of a product are liable for failing to warn if they know or have reason to know the product is or is likely to be dangerous for its intended use; they have no reason to believe

the user will realize the potential danger; and, they fail to exercise reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous. *Gardner v. Q. H. S., Inc.,* 448 F.2d 238 (4th Cir. 1971).

**\*4** *Id; see also Gardner,* 448 F.2d at 242 (applying section 388 in South Carolina case). Given the tacit embracement of the principles of section 388 by the *Livingston* court, the adoption of comment "n" and the derivative bulk supplier defense logically follows. *See Higgins v. E.I. Dupont de Nemours & Co.,* 671 F. Supp. 1055, 1059, (D. Md. 1987). Other decisions by the Supreme Court of South Carolina, cited by the district court in its opinion, support this conclusion. *See Marchant v. Lorain Div. of Koehring,* 272 S.C. 243, 251 S.E.2d 189 (1979); *Young v. Tide Craft, Inc.,* 270 S.C. 453, 242 S.E.2d 671 (1978); *Marchant v. Mitchell Distributing Co.,* 270 S.C. 29, 240 S.E.2d 511 (1977). We therefore agree with the district court and conclude that a South Carolina court faced with this issue would recognize the bulk supplier defense.

## V.

Having concluded that the bulk supplier defense is available in South Carolina, we must next consider whether the district court erred in its application of the *Goodbar* factors to the case at hand. In applying the factors, the lower court noted that Holly Hill, by virtue of its receipt of the MSD Sheets and its involvement in a number of trade organizations, was a knowledgeable user of the dangerous chemicals. The court also noted that CSI had no reason to believe that Holly Hill would keep these warnings from its employees and concluded that it would be overly burdensome for CSI to warn each of the ultimate users of the product. With regard to this latter point, the court found:

> (1) Only Holly Hill would be able to control the chemical containment, training and warning of its employees on a continuing basis;

> (2) Determining who might be exposed to the chemical products would require constant supervision by a bulk supplier over the purchaser's employees;

> (3) The customary manner of delivery of the chemicals, *i.e.* by tanker truck, renders the option of placing warning labels on individual containers unavailable;

(4) The practice of storing constituent chemicals in tanks prior to use makes it uncertain that the employees who are present at delivery will be the same ones exposed to the chemical at the time of mixing and/or application to the lumber;

(5) Given the turnover of the employees in any sizeable business, only the employer would practically provide for training and warnings for new employees.

J.A. at 301.

Coffey disagrees with the district court's conclusion and asserts that the bulk supplier defense does not apply to this case since CSI could have taken greater measures to ensure that the ultimate users of the chemicals received warnings. Coffey suggests that CSI could have sent all of its chemicals in bags (containing warning labels) and could have been more involved in warning those Holly Hill employees who would come in contact with the chemicals.

Coffey's argument fails to take into account the rationale behind the bulk supplier defense. The bulk supplier defense seeks to balance the dual objectives of facilitating the efficient transportation of goods while at the same time ensuring that the ultimate users of the goods are provided with appropriate information about them. As long as the supplier has provided satisfactory warnings to a reliable intermediary, it has satisfied its obligations and need not take every measure possible to ensure that the intermediary does in fact warn the ultimate user. Thus the inquiry is not, as Coffey suggests, whether the bulk supplier could have done *more* to ensure that the ultimate users received sufficient warnings; instead, the inquiry is whether the bulk supplier used reasonable care in providing the necessary warnings to a reliable intermediary. We find no error in the lower court's determination that CSI used reasonable care in providing the necessary warnings to Holly Hill.

**\*5** Coffey next asserts that even if the bulk supplier defense defeats his negligent failure to warn claim, his strict liability claim must survive because of the inherent differences between the two claims. In a failure to warn context, we see no significant distinction between a negligence claim and a strict liability claim. *See Werner v. Upjohn Co.,* 628 F.2d 848, 858 (4th Cir. 1980), *cert. denied,* 449 U.S. 1080 (1981); *Higgins,* 671 F. Supp. at 1059-1060; W.L. Prosser and W.P. Keaton, *Torts* § 99 at 697 (5th ed. 1984). We therefore conclude that the bulk supplier defense defeats Coffey's strict liability claim in the same manner it defeats his negligence claim.

## VI.

For the reasons stated herein, the decision of the district court is affirmed.

### AFFIRMED

WILKINS, Circuit Judge, concurring and dissenting:

I agree with the majority that the courts of South Carolina would adopt the bulk supplier defense contained in the *Restatement (Second) of Torts* § 388 cmt. n (1965). Moreover, I agree that on the evidence presented below, viewed in the light most favorable to Coffey, this defense is applicable as a matter of law. Having concluded that CSI is entitled to raise the bulk supplier defense, however, the dispositive issue becomes whether CSI sent Material Safety Data Sheets (MSD Sheets) to Coffey's employer, Holly Hill. I disagree with the conclusion of the majority that Coffey's affidavit, submitted in opposition to CSI's motion for summary judgment, was insufficient to create a genuine issue of material fact on this question.

H. M. Lupold, the President of Holly Hill during the relevant period, swore that CSI transmitted MSD Sheets and periodic changes in safety data to him "and supervisory plant personnel." In addition, Lupold stated in his affidavit that it was his "practice to transmit these to Mr. Coffey in his capacity as Treating Plant Manager for dissemination to other company employees." Coffey, however, swore that he would have known if CSI was periodically sending safety data to Holly Hill and that no MSD Sheets were furnished to Holly Hill or to him during the pertinent period. The majority concludes that Coffey's assertion that Holly Hill did not receive MSD Sheets from CSI is insufficient to raise a genuine issue of material fact on this issue because Coffey did not have personal knowledge of whether Lupold received these materials. I disagree that Coffey's affidavit is insufficient.

Viewing the facts in the light most favorable to Coffey, I believe that his position as plant manager removes his assertion that he was in a position to know whether Holly Hill received MSD Sheets from CSI from the realm of "bold assertion" and places it in the realm of reasonable inference. Moreover, the majority would agree that the conflicting evidence from Coffey and Lupold creates a question of fact concerning whether Lupold actually transmitted to Coffey the safety materials that Lupold swore he received. To my mind, this factual dispute raises a question of Lupold's credibility that bears on the central issue of whether Lupold actually received the MSD Sheets purportedly transmitted by CSI.[*] Indeed, if calling Lupold's credibility into question is insufficient, one is

**Coffey v. Chemical Specialties, Inc., 4 F.3d 984 (1993)**

left to wonder what evidence Coffey could present that, in the view of the majority, would be sufficient.

**\*6** Had summary judgment been denied and this litigation allowed to continue, it may well have been resolved in favor of CSI. This result would have been reached because the trier of fact found Lupold, and other defense witnesses, credible and Coffey lacking in this regard. But, issues of credibility are not properly resolved at the summary judgment stage. I, therefore, would reverse the

grant of summary judgment in favor of CSI and remand for further proceedings.

**Parallel Citations**

1993 WL 318886 (C.A.4 (S.C.))

Footnotes

[1]     Several of the MSD Sheets recommended the use of dust respirators. J.A. at 238, 247.

[2]     Coffey filed a motion for reconsideration with the district court in which he attached affidavits from two attorneys who represented him for a related workers' compensation claim. This additional evidence fails to establish a genuine issue of material fact.

[*]     While I do not consider this material in reaching my decision, I note that affidavits of attorneys representing Coffey in his workers' compensation claim, submitted to the district court by Coffey with his motion for reconsideration, further call Lupold's credibility into question. These attorneys swore that during a conference surrounding those proceedings Lupold stated that CSI had not provided him with any information concerning the safety equipment necessary for the proper handling of the chemicals.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

**985 F.2d 553**
**Unpublished Disposition**
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. See CTA4 Rule 32.1.
United States Court of Appeals,
Fourth Circuit.

Dr. Emma Winifred SEWELL t/u/o Maryland
CAsualty Insurance Company,
*Plaintiffs-Appellants,*
v.
WRAP-ON COMPANY, INCORPORATED,
*Defendant-Appellee.*

No. 92-1720. | Argued: November 30, 1992 |
Decided: January 29, 1993

Appeal from the United States District Court for the
District of Maryland, at Baltimore. William M.
Nickerson, District Judge. (CA-90-2829-WN)

**Attorneys and Law Firms**

Paul R. Bartolacci, COZEN & O'CONNOR,
Philadelphia, Pennsylvania, for Appellant.

Daniel Karp, ALLEN, JOHNSON, ALEXANDER &
KARP, Baltimore, Maryland, for Appellee.

Richard L. Flax, MASON, KETTERMAN & MORGAN,
Baltimore, Maryland, for Appellant.

Valeria I. Shealer, ALLEN, JOHNSON, ALEXANDER
& KARP, Baltimore, Maryland, for Appellee.

D.Md.

AFFIRMED.

Before WIDENER, PHILLIPS, and HAMILTON, Circuit
Judges.

**Opinion**

PER CURIAM:

## OPINION

*1 Dr. Emma Sewell (Sewell) appeals the summary
judgment granted by the United States District Court for
the District of Maryland in favor of the
defendant-appellee, Wrap-On Company, Inc. (Wrap-On).
Sewell's claims against Wrap-On stemmed from a fire in
her home, inflicting over $300,000 in damages, which
Sewell claimed resulted from a defect in soil heating
cables (heating cables) manufactured by Wrap-On.

The district court dismissed all of Sewell's claims,
including: (1) negligent failure to warn; (2) strict liability
for inadequate warnings; (3) strict liability for selling a
defective product; (4) breach of an express warranty; (5)
breach of the implied warranty of fitness for a particular
purpose; and (6) breach of the implied warranty of
merchantability. The district court dismissed the first two
claims because Sewell failed to produce sufficient
evidence that the alleged inadequate warnings caused the
fire and the latter four claims primarily because Sewell
failed to produce sufficient evidence to establish a defect
in the heating cables.

Although we disagree with the district court with respect
to the causation issue, we nonetheless affirm the dismissal
of the failure to warn claims ((1) & (2)) on the basis that
Sewell did not adequately establish that Wrap-On knew or
should have known that its heating cables might ignite
nearby combustible materials. We also affirm the
dismissal of the latter four claims because Sewell did not
adequately establish a defect in the heating cables.

I

Wrap-On manufactures, among other things, "Gro-Quick"
electric heating cables, which assist in germination and
seedling growth during the winter months by supplying
constant bottom soil heat to seedling containers. Sewell
has used heating cables since 1965. She purchased her
first Wrap-On heating cable at the end of the 1987
growing season (spring) and another such cable in
February 1988, before beginning that year's seedling
germination.

Sewell's basic arrangement for growing plants remained
unchanged from 1965 until a fire destroyed her home on
April 11, 1988. She germinated the seedlings in her
"greenhouse," a room which is part of the main structure
of her house. On the west wall of the greenhouse, Sewell
placed seven "flats" on counters, four to the right of a sink
and three to the left.[1] Sewell used one heating cable to
service the four flats to the right of the sink and the other

heating cable to service the three flats to the left. Sewell plugged the heating cable to the right of the sink directly into an electrical outlet, but used an extension cord to connect the cable to the left of the sink to the same outlet. Sewell did not use a thermostat to gauge the temperature of the heating cables in any of the flats. Joint Appendix (J.A.) at 124.

To allow each heating cable to service multiple flats, on each side of the sink Sewell placed the flats side by side, about three-fourths of an inch apart. She then ran each heating cable from one flat over the edge and into the next flat. Within each flat, Sewell first placed approximately one inch of soil. She then laid the heating cable on top of this soil. To keep the heating cable in position, Sewell placed pebbles, gravel and metal brads (staples) around the heating cable in each flat. Sewell then laid approximately another inch of soil over the heating cable and set plastic trays on top of this soil. These plastic trays did not touch the heating cable. Inside the trays, Sewell placed plastic Jiffy Strips (individual seedling containers) containing soil and the seedlings.

**2** Sewell used the heating cables continuously during the germination period, which lasted from January to April or May of each year. To promote seedling growth during this period, Sewell watered the individual Jiffy seedling containers, but not the soil in the flats. After the germination period, Sewell moved the plastic trays to the east wall of the greenhouse and unplugged the heating cables. However, Sewell left the flat and cable arrangement in place during the off season.

Sewell purchased the new Wrap-On heating cables because in May 1987 her existing heating cables charred the plastic trays, causing a small fire. Sewell quenched the fire herself and did not notify either the fire department or her insurance company.[2] Before installing the new Wrap-On heating cables, Sewell read the accompanying installation instructions. These instructions advised the purchaser to:

1) Fill the flat with adequate depth of soil (normally about four inches);

2) Use vinyl tape or insulated electrical staples to hold the heating cable in place;

3) Place [the heating cable] in parallel loops about three to four inches apart and three to six inches from the edge of the [flat];

4) Avoid overlapping the heating cable under any circumstances; and

5) Never slice the heating cable loop to shorten or lengthen it, as that would cause an immediate malfunction.

J.A. at 256. In addition, the illustration accompanying the instructions showed only one flat per heating cable. *Id.* The instructions also described the heating cables as "safe" and "low heat intensity." However, the instructions contained no warning to keep the heating cables away from combustible materials, or that improper installation might cause fires.

After purchasing the Wrap-On heating cables, Sewell read the accompanying instructions, installed the heating cables in her traditional set up and, in February 1988, began using the two Wrap-On heating cables to germinate the seedlings. On the night of April 11, 1988, Sewell awoke and escaped her house without harm when her smoke alarm detected a fire. While the fire was still burning, Assistant Fire Marshal Patrick Ryan (Ryan) arrived at the scene to investigate the possible cause of the fire. This investigation focused on "determin[ing] where the fire occurred." J.A. at 133.

By examining the most extensive areas of burn damage and various burn patterns, Ryan concluded that the fire originated in the greenhouse. J.A. at 133. Within the greenhouse, Ryan concluded that the fire originated in an area to the right of the sink on the west wall of the greenhouse. J.A. at 140. Ryan extracted "quite a mass" of "strands of wiring which appeared to have been housed with insulation" from this area of the greenhouse. These wires presumably came from the remains of the heating cables. Ryan intended to examine these wires with greater scrutiny but lost them before doing so. J.A. at 141. Ryan determined that the fire scene contained no conclusive evidence of any electrical failure causing the fire. J.A. at 154.

**3** In his report completed after his investigation, Ryan wrote:"This fire appeared to have resulted from the referenced heating coil conveying heat to combustible materials causing a prolonged overheat." J.A. at 234. Ryan concluded in his report that the fire stemmed from "heating equipment in greenhouse ignit[ing] combustible [materials]." J.A. at 233. Ryan explained the basis for his conclusion as follows:

> After identifying the point of origin which has been described, the next step o[f] investigation would be to determine a fire load. I felt as though I had identified an ignition point, or rather, an ignition source

because in short, there was simply nothing there to have caused the fire. I was satisfied that the fire had occurred at that bench in the corner, that this wiring that I referred to was associated with that fire ... because [there] was nothing else there to have provided any ignition source. And again, the next step at that point was to identify what could have burned to cause unopen burning or complete this process of heating and in this case, there was some molten material on the floor and attached or adhered to the wooden structural members of the bench.

J.A. at 227.

After the fire, David J. Malberg (Malberg), an investigator for Sewell's home insurance company, investigated the fire scene in an attempt to determine the cause of the fire. During his inspection of the fire scene, Malberg noticed that "[s]everal portions of the heat cable were heavily burned in certain spots onto these trays and the trays were also burned where the heating cables were burned, as if the cable overheated in certain spots and started burning and ignited these trays!" J.A. at 237. After his inspection, Malberg concluded that "the cause of the fire is related to the apparent overheating of one of the heat cables. No other cause for this fire was found in this area of origin." J.A. at 239. Malberg added that the overheating apparently originated within the heating cable, as opposed to from the external heat emanating from the fire. J.A. at 230. However, Malberg specifically noted that he could not determine "what actually caused the overheating in the cable." J.A. at 232.

Sewell also hired Charles C. Crim (Crim), a metallurgical expert, to investigate potential causes for the fire. Crim inspected the fire scene and debris found there, uncovering some wiring remaining from the heating cables. Crim noted that this wiring had partially melted and concluded that such melting could only result from some internal surge of electricity, possibly caused by a short circuit or arcing. J.A. at 249. Crim explained that the degree of heat required to melt such wiring could only come from a surge of electricity running through the wiring, rather than a normal fire. Crim added that this melted wiring "may have acted as a source of ignition...." *Id.* However, Crim specifically noted that he could not conclude whether the short circuit occurred before or after the fire, J.A. at 250, and offered no opinion as to whether

a defect in the heating cable or some external source caused the short circuit. J.A. at 178.

**\*4** Finally, Sewell deposed John Gust (Gust), the Director of Engineering for Wrap-On, primarily to determine whether Wrap-On knew before the fire that its heating cables might ignite combustible items placed near the heating cables. Sewell sought to establish this knowledge by questioning Gust about another Wrap-On product, electric heating tapes, and the reasons why, before Sewell's fire, Wrap-On began adding warnings to the heating tapes' instructions that improper installation might cause fires. Sewell also inquired why, in 1987, Wrap-On began considering changes to the instructions for the heating cables.

Gust stated that Wrap-On manufactured two heat resistant products: heating tapes, which wrap around pipes and use heat generated by electricity to keep the pipes from freezing, and heating cables. When in use, the heating tapes often come into contact with flammable items such as insulation. Gust indicated that Wrap-On began revising the instructions for the heating tapes in 1984, primarily because the Consumer Products Safety Commission (CPSC) informed Wrap-On that the heating tapes could cause fires. J.A. at 263. These new instructions included warnings that improper installation of the heating tapes might cause fires. J.A. at 265. Gust added that the CPSC never issued any similar warnings for the heating cables. J.A. at 263.

Gust also stated that Wrap-On began considering changes to the instructions for the heating cables in 1987. J.A. at 262. Gust indicated that Wrap-On initiated such action because "it was just a natural flow since we had adopted that strategy with the heat tapes to continue it into this and other products of an electric nature." J.A. at 264.[3] This action culminated in Wrap-On issuing new heating cable instructions after Sewell's fire in 1988. These new instructions warned that improper installation of the heating cables might cause fires. In addition, the new instructions warned that "[t]his equipment is not intended for use in conjunction with any plastic containers whether rigid or foam in nature." J.A. at 267, 288. Sewell asked Gust to clarify the reason for these new warnings, leading to the following discourse:

Counsel:What was the reason for adding on to the instruction sheet a warning about the potential risks involved in using the [heating tapes]?

Gust:Well, essentially this was a result of a conversation that I had with the officers in 1984. I had advised them that we had a note from the CPSC saying or requesting a reason why we didn't warn about fire

and one of the officers said to me 'can heat[ing] tape[s] start a fire,' and I said 'I have not seen one' and I said 'on the other hand, I cannot tell you that it cannot start a fire,' so, therefore the decision was made.

Counsel:That was with regard to the heat[ing] tape[s], right?

Gust:That is with regard to any resistance electrical product.

Counsel:Why did you wait from 1984 to 1988 to make the change on the soil heating cable instructions?

**\*5** Gust:We knew of no problem then and we know of no problem now.

Counsel:Why do you warn now of the risk of fire if you know of no problem now?

Gust:Primarily due to the concept of failure to warn in the legal profession.

J.A. at 265-66. Gust added that the evidence from the Sewell fire, *i.e.,* the heating cables and the plastic trays melting together, induced Wrap-On to include the specific warning against using the heating cables in conjunction with plastic containers. J.A. at 268. Gust also noted that no other factor contributed to the decision to add the warning against using the heating cables with plastic containers. *Id.*

Armed with the testimony from Ryan, Malberg, Crim and Gust, Sewell filed suit against Wrap-On on October 31, 1990. Sewell alleged six claims, including: (1) negligent failure to warn; (2) strict liability for inadequate warnings; (3) strict liability for selling a defective product; (4) breach of an express warranty; (5) breach of the implied warranty of fitness for a particular purpose; and (6) breach of the implied warranty of merchantability.

Wrap-On then moved for summary judgment against Sewell on all of her claims. The district court granted Wrap-On's motion, dismissing all of Sewell's claims. With respect to failure to warn claims, ((1) and (2)), the district court reasoned that Sewell produced no evidence "indicating that her 'improper' installation of the soil heating cables caused the fire," or that "additional warnings would have prevented the fire." J.A. at 332. With respect to the remaining claims, the district court reasoned that "Sewell presented no evidence of a specific product defect." J.A. at 334. Specifically, the district court opined that Sewell "offered no testimony as to *why* the heating cables ignited combustible (plastic and wood)," and that Sewell presented no evidence "that any short

circuit was the result of a defect in the cables rather than the result of some other cause." J.A. at 334, 335 (emphasis in original).

## II

In her appeal, Sewell first argues that the district court improperly awarded summary judgment against her, dismissing her two failure to warn claims.[4] Specifically, Sewell contends that she presented sufficient evidence to create material issues of fact on each element of her failure to warn claims. In analyzing Sewell's argument, we must first review the appropriate standard for granting summary judgment, and then, applying this standard, determine whether Sewell produced sufficient evidence to establish each element of a failure to warn claim under Maryland law.

## A

A district court shall award summary judgment if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial [and][t]he moving party is 'entitled to judgment as a matter of law.' " *Id.* at 323 (citations omitted).

**\*6** If the evidence favoring the non-moving party is"merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (citations omitted). In addition, inferences to be drawn from the nonmoving party's evidentiary facts must be "reasonable in light of the competing inferences...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.

1987) (citation omitted). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson,* 477 U.S. at 247-48. Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be"material." *Id.*

**B**

Under Maryland law, to establish a failure to warn claim against a seller, a plaintiff must show that:

> (1) the seller knew or had reason to know that the chattel was likely to be dangerous for the use for which it was supplied;
>
> (2) the seller had reason to believe that those for whose use the chattel was supplied would not realize its dangerous condition; and
>
> (3) the seller failed to exercise reasonable care to inform them of the dangerous condition.

*Dechello v. Johnson Enterprises,* 536 A.2d 1203, 1207 (Md. App. 1988) (quoting Restatement (Second) of Torts § 388). In addition, the plaintiff must establish two distinct elements of causation: (1) that "the contingency or condition that should have been warned against was the actual cause of the accident and injuries," 63 Am. Jur. 2d *Products Liability* § 358 (1964); *see also, Owens-Illinois, Inc. v. Armstrong,* 604 A.2d 47, 52-53 (Md. App. 1992), and (2) that had the defendant warned the plaintiff, the plaintiff would"have altered his behavior so as to avoid injury." M. Stuart Madden, Products Liability § 10.7 at 404 (2d ed. 1988). *See also, Owens-Illinois,* 604 A.2d at 5152.

In the present case, Sewell alleged that Wrap-On failed to provide six specific warnings for its heating cables. These omitted warnings included that: (1) she should have used separate thermostats for each heating cable; (2) she should have kept the heating cables away from plastic or other flammable items; (3) she should have used one heating cable to heat only one flat; (4) she should have attached the heating cable to hardware cloth; (5) she should have avoided placing the heating cables against wood; and (6) she should have covered the heating cables with three inches of soil. Sewell contends that had Wrap-On included these warnings in the heating cable instructions, the fire would not have occurred.

The district court dismissed Sewell's failure to warn claims against Wrap-On, reasoning that Sewell did not produce any evidence establishing that Wrap-On's failure to warn caused the fire. Specifically, the district court opined "Sewell has offered no evidence indicating that her improper installation of the [heating cables] caused the fire, *e.g.,* that the lack of separate thermostats or the presence of plastic Jiffy trays, or the lack of any hardware cloth in any way caused the fire." J.A. at 332. Although we agree with the district court that Sewell presented no evidence that the first, third, fourth, fifth and sixth alleged inadequacies in Wrap-On's instructions caused the fire, we think Sewell's evidence did create a material issue of fact as to whether the second alleged inadequacy-that Sewell should have kept the heating cables away from combustible materials-caused the fire.

**\*7** Traditionally, the causation element of any tort claim requires proof that "the defendant's conduct ... was a material element and a substantial factor in bringing [a certain event] about." W. Page Keeton et al., Prosser and Keeton on the Law of Torts§ 41 at 267 (5th ed. 1984). *See also, Eagle-Picher v. Balbos,* 604 A.2d 445, 463 (Md. 1992); *Owens-Illinois,* 604 A.2d at 52-53. If the plaintiff establishes that the defendant's conduct substantially contributed to the plaintiff's injury, "it follows that [the defendant] will not be absolved from liability merely because other causes contributed to the plaintiff's injury." Prosser § 41 at 267.

A plaintiff may satisfy her burden of proof on the element of causation by producing evidence providing "a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant [substantially contributed to the plaintiff's injury]." *Id.* at 269. However, when the plaintiff's evidence equally supports two or more possible causes for her injury, one of which the defendant is responsible for and the other of which it is not, the plaintiff has not met her burden of proof. *Id.* (citing *Altrichter v. Shell Oil Co.,* 161 F. Supp. 46, 49 (D. Minn. 1955); *Lane v. Hampton,* 87 S.E.2d 803, 806 (Va. 1955)). *See also, Krause v. Sud Aviation Societe Nationale de Construction Aeronautiques,* 413 F.2d 428, 432 n.4 (2d Cir. 1969); *Reder v. Hanson,* 338 F.2d 244, 247 (8th Cir. 1964). In such circumstances, courts reason that the fact finder could only speculate as to the cause of the plaintiff's injury.

In the present case, these principles required Sewell to produce evidence showing that at least one of the conditions which she claims Wrap-On should have warned against substantially contributed to the fire. In addition, to have probative value this same evidence cannot equally support an alternative inference that some

other factor for which Wrap-On was not responsible substantially contributed to the fire.

We think that the statements elicited from Ryan and Malberg satisfied this burden. In his report, Ryan stated that "the fire appeared to have resulted from the referenced heating coil conveying heat to combustible materials causing a prolonged overheat." J.A. at 234. In addition, Malberg concluded that "[s]everal portions of the heating cable were heavily burned in certain spots onto these trays and the trays were also burned where the heating cables were burned, as if the cable overheated in certain spots and started burning and ignited these trays!" J.A. at 237. These statements suggest that the close proximity of the heating cables to combustible plastic substantially contributed to the fire. In addition, such evidence does not equally support an inference that some other factor substantially contributed to the fire. Thus, we think Sewell produced sufficient evidence to establish that Wrap-On's failure to warn against placing combustible materials near the heating cables caused the fire.

### C

**\*8** Although we disagree with the district court on the causation issue, we may nonetheless affirm the dismissal of Sewell's failure to warn claims on different grounds if fully supported by the record. *Stern v. Merrill Lynch, Pierce, Fenner & Smith,* 603 F.2d 1073, 1093 (4th Cir. 1979) (citing *Eltra Corp. v. Ringer,* 579 F.2d 294, 298 (4th Cir. 1978)). Accordingly, we think that Sewell produced insufficient evidence to establish the first element of her failure to warn claim, *i.e.,* that Wrap-On "knew or had reason to know that the [heating cables were] likely to be dangerous for the use for which [they were] supplied." *Dechello,* 536 A.2d at 1207.[5]

Sewell relies on three evidentiary facts to establish such knowledge by Wrap-On: (1) the fact that Wrap-On knew as early as 1984, from CPSC reports, that its heating tapes could ignite nearby combustible objects; (2) the fact that Wrap-On began considering changes to its heating cable instructions in 1987, before Sewell's fire in 1988; and (3) the fact that Wrap-On's heating cable instructions issued after the fire specifically warned against using the heating cables in conjunction with plastic containers. However, we think that none of these facts create a reasonable inference that Wrap-On knew, before Sewell's fire in 1988, that its heating cables might ignite combustible objects placed in close proximity to the heating cables. We shall discuss our conclusions with respect to each evidentiary fact separately.

Sewell first contends that a fact finder might reasonably infer the requisite knowledge by Wrap-On from the fact that Wrap-On knew, as early as 1984, that its heating tapes exhibited a tendency to ignite nearby combustible materials. Sewell reasons that heating tapes and heating cables comprise part of Wrap-On's "resistance heating" product line, and that, therefore, knowledge of the heating tapes' propensities creates a reasonable inference that Wrap-On had similar knowledge about its heating cables. To support this argument, Sewell cites to *Bastian v. TPI Corp.,* 603 F. Supp. 474 (N.D. Ill. 1987).

In *Bastian,* the plaintiff sought to establish that a manufacturer knew that its baseboard heater had a tendency to cause fires by introducing evidence of "substantially similar" prior occurrences with other baseboard heaters manufactured by the defendant. The manufacturer argued that such evidence did not indicate the requisite knowledge in that the prior incidents were not "sufficiently similar because they involved heaters with different model numbers." *Id.* at 477. The court rejected this argument, reasoning that the plaintiff had alleged that the heaters involved in the prior incidents contained the same design as the heater in the present case and that any differences among these heaters were primarily cosmetic. *Id.*

In the present case, however, Sewell made no allegations and presented no evidence indicating any similarity in the designs of the heating cables and the heating tapes. In addition, at oral argument WrapOn emphasized that, when in use, its heating tapes often touch combustible items such as insulation. In contrast, the heating cables usually remain surrounded by non-combustible soil when in use. In light of Sewell's failure to produce any evidence illustrating similarities in the designs of the two products and the substantially different environment in which the two products are used, we conclude that WrapOn's knowledge that its heating tapes might ignite nearby combustible materials should not equate to similar knowledge about the heating cables. The mere fact that these two products comprised part of the same product line does not alter our conclusion.

**\*9** Sewell next contends that a fact finder could reasonably infer the requisite knowledge by Wrap-On from the fact that Wrap-On began considering changes to the heating cable instructions in 1987, before Sewell's fire. We disagree. Sewell offered no evidence suggesting *why* Wrap-On began considering changes to these instructions before the fire in 1988. The only evidence on this issue is Gust's uncontradicted statement that Wrap-On considered changing the heating cable

instructions because it had already changed the instructions for "other products of an electrical nature." J.A. at 264. In addition, Sewell produced no evidence that, before Sewell's fire in 1988, Wrap-On specifically considered adding warnings that users should avoid placing combustible materials near the heating cables. In summary, we conclude that the mere fact that a manufacturer begins considering general revisions to a product's instructions does not, by itself, suggest that the manufacturer knew of a specific product danger. *Haysom v. Coleman Lantern Co.,* 573 P.2d 785, 791 (Wa. 1978) ("A subsequent change in instructions may be implemented to improve a product for reasons other than to cure a serious defect.").

Sewell's third and final evidentiary fact also fails to establish the requisite knowledge by Wrap-On. Sewell's last evidentiary fact relates to the heating cable instructions issued after Sewell's fire, which contain a specific warning to avoid using the heating cables with plastic containers. However, Gust's uncontradicted testimony indicates that Wrap-On issued this specific warning because of the evidence obtained from Sewell's fire. Thus, Sewell has simply failed to present any correlation or nexus between the new instructions and Wrap-On's knowledge before her fire in 1988. In the absence of such a nexus, we adhere to the time-honored principle that warnings added *after* an accident do not indicate knowledge of a specific danger *before* the accident. *Hagan v. Washington Suburban Sanitary Com'n.,* 314 A.2d 699, 703 (Md. App. 1974) (evidence of subsequent remedial measures cannot "fill the evidentiary void of[defendant's] knowledge of the existence of a latent danger prior to the accident."). *See also, Grenada Stell Industries, Inc. v. Alabama Oxygen Co., Inc.,* 695 F.2d 883, 888 (5th Cir. 1983); *Werner v. Upjohn Co.,* 628 F.2d 848, 857 (4th Cir. 1980), *cert. denied,* 449 U.S. 1080 (1981); *Morris v. Wilson,* 539 A.2d 1151, 1156 (Md. App. 1988).

In conclusion, we hold that the district court erroneously determined that Sewell failed to produce sufficient evidence to establish that Wrap-On's failure to warn against placing combustible materials near the heating cables caused the fire. However, we nonetheless affirm the dismissal of Sewell's failure to warn claims on the basis that Sewell's evidence provides no reasonable inference that WrapOn knew or should have known, before Sewell's fire, that its heating cables might ignite nearby combustible materials.

### III

**\*10** Sewell also contends that the district court improperly awarded summary judgment against her remaining claims, which included: (1) strict liability for selling a defective product; (2) breach of an express warranty; (3) breach of the implied warranty of fitness for a particular purpose; and (4) breach of the implied warranty of merchantability. Specifically, Sewell objects to the district court's conclusion that "Sewell presented no evidence of a specific product defect." J.A. at 332. The district court relied on this conclusion to dismiss all four of Sewell's remaining claims.

Sewell offers two arguments to support her contention that she produced sufficient evidence to establish a product defect. First, Sewell claims that Maryland law does not require her to prove a specific defect in the heating cables. Rather, Sewell contends that she needed only prove that "the product malfunctioned, that it was given only normal or anticipated use prior to the accident and that there are no reasonable, secondary causes which were responsible for the accident." Brief of Appellant at 18 (citing *Breidor v. Sears Roebuck & Co.,* 722 F.2d 1134, 1140-41 (3d Cir. 1983)). Sewell contends that her evidence satisfied this test. Second, Sewell claims that Crim's conclusions that the heating cables short circuited, coupled with the lack of evidence indicating potential causes for the short circuit other than a product defect, satisfied her burden of proof.

We disagree with both of Sewell's arguments. Under Maryland law, a plaintiff cannot merely rely on the occurrence of an accident to establish a product defect. Rather, the evidence must show "that it is more probable than not that the defect existed at the time of sale." *Virgil v. "Kash n' Karry" Serv. Corp.,* 484 A.2d 652, 657 (Md. App. 1984). The plaintiff can satisfy this burden in an accident "where circumstantial evidence tends to eliminate other causes." *Id.* However, if such evidence equally supports two conflicting inferences, the plaintiff failed to establish a defect. Prosser§ 41 at 269.

In the present case, Sewell's evidence indicates that the heating cables overheated and that such overheating probably resulted from a short circuit causing an internal surge of electricity. However, none of Sewell's evidence suggests that the short circuit more probably resulted from a defect in the heating cables than from some other external cause. Specifically, none of Sewell's experts reached any conclusions as to what caused the short circuit in the heating cables. Malberg conceded "what actually caused the overheating in the cable [i.e. the short circuit], I don't know," J.A. at 232; while Crim acknowledged that he could not conclude whether a defect in the heating cable or some external source caused

the short circuit. J.A. at 178. In addition, Ryan's testimony did not even mention a short circuit in the cables, much less any potential causes for it. Thus, Sewell's theory for establishing a product defect rests on the mere occurrence of an accident and not on any plausible explanation for what caused the short circuit. In short, because Sewell's expert testimony equally supports inferences that either a product defect or some external source caused the heating cables to short circuit, her remaining claims cannot be sustained.[6]

**\*11** We, therefore, affirm the district court's award of summary judgment dismissing Sewell's claims for (1) strict liability for selling a defective product; (2) breach of an express warranty; (3) breach of the implied warranty of fitness for a particular purpose and (4) breach of the implied warranty of merchantability.

**IV**

For the reasons stated herein, we affirm the district court's award of summary judgment, dismissing all of Sewell's claims against Wrap-On.

*AFFIRMED*

**Parallel Citations**

1993 WL 18329 (C.A.4 (Md.))

Footnotes

[1]    The parties define "flats" as shallow wooden boxes, having dimensions of 20" x 12" x 3", with open slats in the bottom. These flats contained the soil heating cables and the seedlings.

[2]    Sewell could not remember who manufactured the old heating cables.

[3]    Notably, the record contains no evidence indicating what specific instructions or warnings Wrap-On considered adding to the heating cable instructions before Sewell's fire in 1988.

[4]    Maryland recognizes that "[t]he standard for liability under strict liability and negligence [in failure to warn cases] is essentially the same." *Weinberger v. Bristol-Myers Co.,* 652 F. Supp. 187, 192 (D. Md. 1986). Thus, these two claims will be addressed together.

[5]    Notably, Maryland law requires a plaintiff to show that the seller knew or should have known of a product danger to establish a failure to warn claim in either negligence or strict liability. *Owens-Illinois v. Zenobia,* 601 A.2d 633, 641 (Md. 1992).

[6]    Notably, Sewell's evidence fails even under her own standard, because her evidence did not tend to eliminate "reasonable, secondary causes" for the short circuit. Brief of Appellant at 18. In addition, we think it is wholly irrelevant that there is no evidence suggesting other possible causes for the short circuit. It was Sewell's burden to prove that a defect in the cables more prob 6350 35 7 ably caused the short circuit than some other factor.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.